## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**LAWRENCE T. BUSH,**

    **Plaintiff,**

vs.                                                                     Civ. No. 02-028 WPJ/RLP

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

    **Defendant.**

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

1.     Lawrence T. Bush ("Plaintiff" herein) alleges that he has been unable to work since April 17, 1991, due to a combination of impairments including loss of use of his right hand and arm, frequent migraine headaches, chronic depression, persistent low back pain, joint pain and pain in both elbows and left hand. (Tr. 80). Plaintiff filed claims for disability income benefits ("DIB" herein) and supplemental security income ("SSI" herein) on May 14, 1998. (Tr. 68, 592). He was last insured for DIB as of December 31, 1996. (Tr. 54, 71, 76). His applications were denied at the first and second levels of administrative review, and by an Administrative Law Judge following a hearing, in a decision dated March 21, 2000. The matter before the Court is Plaintiff's Motion seeking to reverse this denial and to remand his claims to the Commissioner of Social Security for rehearing.

2.     Plaintiff was convicted of a felony in 1991, and was incarcerated in state prison until January 1998. (Tr. 135, 187, 573). The date he was arrested on these charges coincides with his alleged date

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

of onset of disability. (Tr. 80).   He is not eligible for DIB or SSI benefits during the time he was imprisoned.[2]

3.	For the reasons stated here, I recommend that Plaintiff's motion be granted.

I.
Factual Background

4.	Plaintiff was born on April 18, 1956.  (Tr. 68).  At age four he sustained burns on his left hand/arm which limit movement of that hand.  (Tr. 135-136).  He was enlisted in the Navy from 1973 to 1976.  (Tr. 84, 573).   He obtained a GED and completed a two year Associate of Arts degree in general studies and business administration.  (Tr. 32, 138).  In 1978 he sustained a severe brachial plexus injury which has rendered his dominant right hand and arm functionally useless.[3]  (Tr. 140-142).  Thereafter he was employed for eight years, first as a dispatcher for an animal control center and then as a 911 emergency services operator. (Tr.  84, 98, 100-101, 112, 137).

5.	Plaintiff has a history of tension and migraine headaches. He received extensive care for headache complaints in 1989, 1990, 1992, 1993, 1995, 1998 and 1999, although there are periods of months or years when headaches are not a problem.  None of his numerous care providers have questioned the presence or severity of the headaches, or the fact that they are not readily responsive to medication. (Tr. 132, 133, 131-132, 130, 127-128, 126-127, 124, 122, 119-120, 117, 474. 469-471, 458, 456, 454, 450, 448, 447, 444, 439, 435, 434, 423, 417-419, 356, 353, 344, 340, 191, 190, 180-185, 173, 171, 502-503, 575).  Plaintiff stated in written reports that headaches had caused him

---

[2] 42 U.S.C.A. §402 (x) (1)(A)(i) (2002 pocket part); 20 C.F.R. §§404.468 & 404.211 (2002).

[3] Plaintiff's right upper extremity has obvious atrophy from the shoulder to the hand.  He can not extent his fingers, which are in flexion contracture, and the hand is capable of very little movement.  He can not extend his elbow fully, has deceased abduction of the right shoulder and diminished biceps strength.  (Tr. 141).

to miss a lot of work while he was a 911 operator (Tr. 103). The only independent confirmation of this assertion is a December 1, 1989, medical chart note indicating that he requested a work excuse during a period he was being actively treated for migraine headaches. (Tr.133). He remained employed for an additional 14 months at the same job. (Tr.123). The specifics of Plaintiff's treatment for headaches will be discussed *infra*.

6.      Plaintiff contends that he has suffered from chronic depression since 1989 (Tr. 80) but did not seek treatment due to the stigma attached to psychiatric care and fear of losing his job. (Tr. 58, 103). The first documented mental health treatment following Plaintiff's alleged date of onset of disability occurred in August 1998 at the Veterans' Administration. On August 21 Virginia Villeponteaux, M.D., interviewed Plaintiff and conducted a mental status examination. She diagnosed Dysthymic Disorder[4], assigned a GAF of 60 and prescribed an anti-depressant. (Tr. 202). On August 31 Plaintiff was evaluated by B.R. Julian, PhD, who conducted an interview and administered the MMPI, the results of which were considered valid. (Tr. 194-195). The MMPI indicated in part:

> Clinical scales suggest an individual who tends to maintain social distance, lack interpersonal trust and may have difficulty expressing anger in a modulated fashion. He may be seen as highly non-conforming with poor social judgment and difficulty profiting from experience. Anti-social acts are a distinct possibility. Likely to form mostly superficial relationships.

(Tr. 194).

Dr. Julian diagnosed Major Depression and Mixed Personality Disorder with Anti-social features. No GAF was assigned. Id. In September Dr. Villeponteaux prescribed a second anti-depressant. (Tr. 193).

---

[4] Dysthymia is defined as a "chronic mood disorder manifested as depression for most of the day, more days than not...." Stedman's Medical Dictionary, 536 (26th ed.1995).

7.      On September 29, 1998, Plaintiff was evaluated by Jaime Michel, MD, a consultant for the Disability Determination Unit. (Tr. 135-139). Dr. Michel interviewed Plaintiff, reviewed a daily activities questionnaire Plaintiff had prepared and conducted a mental status examination.[5] He diagnosed Dysthymia (Axis 1), and assigned a GAF of 37. (Tr. 139).

8.      Plaintiff was seen at the VA by Russell Cottrell, M.D., a staff psychiatrist, on November 17, 1998. At that time Plaintiff reported that his anti-depressant medication was "working most days," that his mood was generally improved but that he still got depressed "at times." Dr. Cottrell diagnosed a longstanding dysthymic disorder intensified by the circumstances of the past 7 years (imprisonment on molestation charge) and his current difficulty functioning. He assigned a GAF of 65, renewed Plaintiff's prescriptions, and scheduled a follow-up appointment for three months. (Tr. 187). On December 2, 1998, Dr. Cotrell increased Plaintiff's dosage of anti-depressant, after Plaintiff reported an increase in anxiety, agitation, impatience, hopelessness and feeling overwhelmed by every-day things. (Tr. 186). There are no other notations regarding care or treatment for depression or dysthymia.

9.      Two non-examining agency psychologists reviewed Plaintiff's mental health care records. On November 4, 1998, G.W. Sutton, PhD., concluded Plaintiff's mental impairment of mild and chronic

---

[5]"Mr. Bush is an Anglo gentleman who appears his stated age. . . He came dressed casually with fair hygiene and grooming. He presented a serious expression on his face and actually gave the impression of having a very flat affect. He was rather hypoactive and, only towards the end of the session did he seem to be somewhat uncomfortable, sitting in the same position. It was very obvious that both hands had very limited functioning.

"Affect was constricted and of low intensity and his mood was flat.

"Speech was in a monotone with no alteration of thought processes. There was no evidence of suicidal ideation nor evidence of psychotic thinking.

"Short term and long term memories seems to be grossly intact.

"Insight and judgment seems to be adequate.

"On the mini-mental status examination, Mr. Bush actually scored 30 out of a maximum of 30 points." (Tr. 138).

depression was not severe, resulting in slight difficulties maintaining social functioning. (Tr. 53, 153-161). On March 3, 1999, LeRoy Gabaldon, PhD, concluded that Plaintiff's social functioning was moderately impaired, but that he retained the ability to engage in work that did not involve much social interaction. (Tr. 53, 208-10, 218-224).

10.    In addition to his right hand/arm injury, Plaintiff alleged impairment of his left hand due to arthralgias[6] caused by overuse. Although there are prior references to "joint pain" in his medical records (see, e.g., Tr. 329, 356, 202), his first recorded complaint related specifically to his left hand was during Dr. Michel's psychiatric evaluation on September 28, 1998, when he complained of and exhibited limited function of his left hand. (Tr. 135-139). Dr. James Skee conducted a physical examination on Plaintiff on October 21, 1998. At that evaluation Plaintiff stated that he suffered arthralgias of the left hand from overuse, which had previously caused him to miss work. Dr. Skee noted scarring on Plaintiff's left arm and hand, without effusion, accepted as true Plaintiff's complaints of arthralgia, but did not describe any functional limitation in the use of the left hand/arm. (Tr. 140-141). Plaintiff complained of left hand pain and morning stiffness to his VA doctors on November 5, 1998. (Tr. 190).

11.    Plaintiff was treated for epicondylitis[7] in 1994, with apparent resolution of his complaints with use of non-steroidal anti-inflammatory medication. (Tr. 373, 365, 364, 362). He did not mention problems with his elbows when evaluated by Dr. Michel or Dr. Skee. Plaintiff has over the years

---

[6]Arthralgia is "severe pain in [a] joint, especially one not inflammatory in nature", Stedman's Medical Dictionary, 25th ed., at 134.

[7] This condition is commonly known as "tennis elbow." The outer bone of the elbow is the lateral epicondyle and is part of the humerus (the bone of the upper arm). Continued stress on the muscles of the forearm can cause inflammation and degeneration of the tendons attached to the lateral epicondyle (tendinitis or lateral epicondylitis). See The Merck Manual (17th ed.1999) at 505.

complained of "joint pain." (see e.g., Tr. 356 [1995], 329 [1996]).  Starting in 1998 he was placed on various medications for complaints of joint pain (200-202, 190-191, 173, 502, 575, 555), and at the time of his administrative hearing was taking Nabumetone[8], Tylenol, Aspirin and Ibuprofen. (Tr. 111).

## II.
## The ALJ's Decision

12. The ALJ found that Plaintiff had only one "severe" impairment, the loss of use of his right hand and arm.  He discounted Plaintiff's credibility as to all other alleged impairments.  He found that Plaintiff retained the residual functional capacity for light work that did not require extensive use of the right arm or fine finger dexterity of the right hand, that he could perform his past jobs as a 911 operator and as a dispatcher, and therefore was not disabled.  (Tr. 12-25).

## III
## Questions presented

13. Plaintiff raises the following issues:

   A. Whether the ALJ failed to adequately develop the record as to Plaintiff's mental impairment, and further, whether his finding that Plaintiff's mental impairment was not severe was unsupported by substantial evidence.

   B. Whether the ALJ erred in evaluating Plaintiff's non-exertional impairment of headaches; and

   C. Whether the ALJ's evaluation of Plaintiff's complaints of pain was unsupported by substantial evidence and/or based on incorrect legal standards.

## IV
## Standard of Review

14. The court reviews the Commissioner's decision to determine whether the records contain

---

[8]Also known as Relafen, a non-steroidal anti-inflammatory medication.  1999 Physicians' Desk Reference at 3085

substantial evidence to support the findings, and to determine whether the correct legal standards were applied.[9]  Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "[10]

15.     The duty to assess whether substantial evidence exists "is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians) --or if it really constitutes not evidence but mere conclusion.' "[11]  The court is not to reweigh the evidence or substitute its judgment for the Commissioner's.[12] The court typically defers to the ALJ on issues of witness credibility.[13]  The record will be examined as a whole, including whatever fairly detracts from the weight of the Commissioner's decision, to determine whether the substantiality of the evidence tests has been met.[14]

16.     The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled.[15]   A disability claim may be denied at step two only if an impairment, or combination of impairments, produces no more than a minimal effect on the claimant's physical

---

[9]Castellano v. Secretary of Health & Human Services, 26 F.3d 1027, 1028 (10th Cir.1994).

[10] Soliz v. Chater, 82 F.3d 373, 375 (10th Cir.1996) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

[11]Gossett v. Bowen, 862 F.2d 802, 805 (10th Cir. 1988), quoting Fulton v. Heckler, 760 F.2d 1052, 1055 (10th Cir. 1985).

[12]Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994).

[13]Hamilton v. Secretary of Health & Human Services, 961 F.2d 1495, 1498 (10th Cir. 1992).

[14]Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).

[15]Reyes v. Bowen, 845 F.2d 242, 243 (10th Cir.1988).

and/or mental ability to do basic work activities.[16] "If such a finding is not clearly established by medical evidence . . . adjudication must continue through the sequential evaluation process."[17] However, the claimant "must show more than the mere presence of a condition or ailment."[18]

## V  Analysis

### Mental Impairment

17.     Plaintiff contends that the ALJ failed to properly develop the record as to the effects of his mental impairment/condition on his activities of daily living, ability to maintain social functioning, deficiencies in concentration, persistence and pain, and whether there had been episodes of deterioration or decompensation in work or work-like setting. [Docket No. 9 at 4-5]. Although Plaintiff was not directly questioned as to these functional areas, he was asked to add any information he wanted to prior to the testimony of the vocational expert, and did not mention any functional problems related to his mental condition. (Tr. 40). The ALJ considered the reports of Plaintiff's treating mental health care providers, the consulting psychiatrist, and the agency reviewing psychologist in evaluating Plaintiff's mental impairment. (Tr. 18-20). Accordingly, I find that the ALJ adequately developed the record as to Plaintiff's mental condition.

18.     The ALJ determined that Plaintiff had slight restriction in his activities of daily living and social functioning, no deficiencies in concentration, persistence and pace, and had never experienced episodes of deterioration in work or work-like settings. (Tr. 25). Plaintiff contends that substantial

---

[16]Soc. Sec. Rul. 85-28.

[17]Id., see also Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988) (holding that if a claimant presents medical evidence which constitutes a mere "*de minimis*" showing of severity, the ALJ must proceed to step three).

[18]Hinkle to Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).

evidence does not support the ALJ's conclusion that Plaintiff's mental impairment was not severe. He generally argues that the ALJ's entire assessment of mental functioning is deficient, but only addresses the ability to maintain social functioning. [Docket No. 9 at 5-7]. Review of the record indicates that the ALJ's evaluation of Plaintiff's activities of daily living, concentration, persistence and pace, and deterioration in work or work-like settings is supported by substantial evidence. (Tr. 86-91). If The ALJ's finding that Plaintiff's social functioning was only slightly impaired is supported by substantial evidence, he correctly determined that Plaintiff's mental impairment was not "severe."[19] In assessing Plaintiff' social functioning, the ALJ stated:

> Claimant describes a reclusive lifestyle, as least immediately after his release from prison. However the evidence in Claimant's medical record that supports more than slight difficulties maintaining social functioning are contained in the notes of the psychologist who tested Claimant in August 1998. For the reasons set forth above, the results of that testing are questionable. Nonetheless, I find that Claimant is slightly affected in his ability to maintain social functioning by his impairment.

(Tr. 19-20).

The testing that the ALJ found questionable is the MMPI administered by treating psychologist Dr. Julian. (Tr. 194). ALJ discredited Dr. Julian's MMPI test results by citing to the nearly contemporaneous diagnosis by Dr. Villeponteaux of dysthymic disorder with a GAF of 60. (Tr. 18-19). Although the ALJ has the ability to resolve conflicts in the medical evidence[20], Dr. Villeponteaux evaluation is not in conflict with that of Dr. Julien's, as a GAF of 60 is indicative of moderate

---

[19]"If the four areas considered by us as essential to work have been rated to indicate a degree of limitation as "none' or "slight" in the first and second areas, "never" or "seldom" in the third area, and "never" in the fourth area, we can generally conclude that the impairment is not severe, unless the evidence otherwise indicates there is significant limitation of your mental ability to do basic work activities.    20 C.F.R. §§404.1520a(c)(1), 416.920a(d)(1) (2000).

[20]Casias v. Sec'y of Health & Hum. Serv., 933 F.2d 799, 801 (10th Cir. 1991).

9

difficulty in social, occupational or school functioning.[21] The ALJ also ignored the opinion of Dr. Gabaldon, who indicated that Plaintiff's social functioning was moderately impaired.

19. I find that substantial evidence does not support the ALJ's determination that Plaintiff's mental impairment, specifically in terms on social functioning, was not "severe" as that term is defined in evaluating impairments at step two of the sequential evaluation process.

### Migraine Headaches and Credibility

20. The ALJ listed the following reasons for finding that Plaintiff's migraine headaches did not constitute a severe impairment. These reasons also impact the ALJ's credibility determination.

21. *Plaintiff reported to the Administration that he was bedridden with headaches a couple of times a week (referring to Tr. 80), which is not the frequency reported to treating physicians (referring generally to the medical records generated by the VA); and, It is difficult to determine if Plaintiff gave the treatment regimens a real try, or whether he was compliant in following treatment plans.*

In a disability report submitted in May 1998, Plaintiff stated his migraines were very severe, and caused him to be bedridden usually a couple of days a week. (Tr. 80). In January 1999, Plaintiff indicated that his migraine headaches were constant, that no effective treatment had been found, and that he could not get out of bed when having a migraine headache. (Tr. 58, 92). The record indicates the following regarding Plaintiff's complaints as to the frequency of his headaches, and treatment initiated by his care providers:

    8/21/98        Migraine headaches sometimes occur three times a week. Started on

---

[21]<u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th Ed. at 32.

10

|  |  |
|---|---|
|  | sertraline[22] . . . which may help migraine (Dr. Villeponteaux). (Tr. 201-202). |
| 9/11/98 | Reports trouble sleeping with sertraline. (Dr. Villeponteaux) (Tr. 193). |
| 9/14/98 | Patient noted to be taking Sumatriptan tablets prn[23]. (Tr. 192) |
| 11/05/98 | Has had six migraines since 9/14. Sumatriptan curtails visual effects and nausea of migraines, but doesn't prevent the pain which remains unchanged. Referred to neurology. (Dr. Taulbee[24]) (Tr. 190). |
| 12/14/98 | Will go several months with no headache and then get headaches up to three a week, then slow down and go away. (Haggerty, RN) (Tr. 180). |
| 12/14/98 | Sometimes I go months without a headache, then get 2 or 3 a week for months or weeks. (Plaintiff) (Tr. 185). |
| 12/14/98 | His significant headaches last 12-16 hours and occur three times a week/but he can go several months in between headaches. Placed on Verapamil for headache prophylaxis, Midrin[25] with Reglan for acute headache and nasal Imitrex[26]. (Dr. Subbaratnam[27]) (Tr. 181-184). |
| 1/8/99 | Had three migraines since last seen, and headaches are not as bad. Medications unchanged. (Dr. Taulbee) (Tr. 173). |
| 1/29/99 | Had significant headaches on 12/26, 1/3, 1/12, 1/16, 1/17, 1/24. Midrin discontinued. Fioricet[28] to be used as needed, Verapamil increased. (Dr. Subbaratnam) (Tr. 171). |

---

[22]Sertraline, brand name Zoloft, is an anti-depressant. 1999 Physicians' Desk Reference, at 2442-2448.

[23]Sumatriptan, brand name Imitrex, is used in the treatment in acute migraine headaches. Id. at 1141-1145.

[24]Plaintiff indicated that Dr. Taulbee was seen every 3-6 months, and prn, for treatment of joint pain, high blood pressure and high cholesterol. (Tr. 104).

[25]Indicated for relief of tension and vascular headaches. 1999 PDR, at 871.

[26]Indicated for the treatment of acute migraine headaches. Id at 1137-1141.

[27]Dr. Subbaratnam is a neurologist who had prescribed various medications for the treatment of Plaintiff's headache complaints. (Tr. 105, 181-182, 171, 503, 575).

[28]Fioricet is indicated for the treatment of tension headache. 1999 PDR, at 2028-2029.

|  |  |
|---|---|
| 4/12/99 | Since seen in January has had a total of 15 migraine headaches. Did have two week period without headache. Fioricet and Sumatriptan discontinued. To continue Verapamil and Imitrex injections. (Dr. Subbaratnam). (Tr. 503). |
| 6/21/99 | Still has migraines weekly. Placed on Depakote[29] and Vistaril[30] with Reglan for acute migraine, dosage of Verapamil decreased. To consider use of nasal DHE[31]. (Dr. Subbaratnam) (Tr. 575). |

At no point in his treatment did Plaintiff's doctors imply that he was non-complaint with recommended treatment. Although the frequency of his headache complaints varied, they remained frequent during the various trials of medication regimens.

22.  *Plaintiff only recently sought consistent treatment for headaches.*

The record indicates that Plaintiff was seen on ten occasions from October 11, 1989 to July 28, 1990, on fourteen occasions from March 27, 1992, to June 15, 1993, and on four occasions from July to September 1995 for complaints of headache pain.

23.  *Plaintiff used Ibuprofen, a medication not ordinarily prescribed for migraine headache, for pain relief while in prison.*

Plaintiff did use Ibuprofen for headache relief while incarcerated. This medication had been recommended by his treating physician in 1989, in connection for his migraine headaches. (Tr.133).

24.  *Plaintiff made inconsistent reports to his doctors as to the pain relief from Elavil.*

The ALJ is correct that on one occasion Plaintiff reported that he had experienced no headaches since increasing his dosage of Elavil approximately one month earlier. (Tr. 450, 454). On occasions both

---

[29]Depakote is indicated for prevention of migraine headache. www.rxlist.com/cgi/generic/dival_ids.htm.

[30]Vistaril is an anti-anxiety medication. 1999 PDR,, at 2430.

[31]D.H.E. or Dihydroergotamine is a nasal solution used to treat migraine headaches. www.nlm.nih.gov/medlineplus/druginfo.

before and after this, he reported that Elavil did not relieve his headaches. (Tr. 458, 454, 450, 447).

25.     *Plaintiff disregarded identified headache triggers.*

The ALJ stated that the triggers for Plaintiff's migraine headaches had been identified as of January 1999, but that he disregarded this information (citing to Tr. 183). In fact, Tr. 183 is a December 14, 1998 note from Plaintiff's initial evaluation for migraine headaches at the VA. In that note, Plaintiff indicated that the had no food or environmental triggers. He was asked to keep a headache diary. (Tr. 181). Thereafter the triggers were identified. (Tr. 171). There is no evidence that he disregarded this evidence.

26.     *There have been significant periods of time since April 1991 when Plaintiff's headaches were under control.*

This finding by the ALJ is accurate.(Tr. 417, 180).

27.     *Plaintiff's neurologist's notes indicating his headaches were currently controlled by medication (referring to Tr. 139, 173, 559-561).*

The records referred to by the ALJ establish that Plaintiff's headaches were under treatment, but not under control. (See ¶21, infra.).

28.     Based on the forgoing, I find that substantial evidence does not support the ALJ's finding that Plaintiff's headache complaints are not "severe."

## VI
## Recommended Disposition

29.     I recommend that Plaintiff's Motion to Reverse and Remand be granted, and that this cause be remanded to the Commissioner for additional proceedings, to include the following:

    A.     Consideration of Plaintiff's impairments of headache pain and impaired social functioning as "severe."

B.	Re-evaluation of the combination of Plaintiff's impairments at steps four and five of the sequential evaluation process.

C.	Obtaining the services of a vocational expert in order to properly evaluate Plaintiff's non-exertional impairments.

D.	Determination of the date of onset of disability, pursuant to the criteria established in Ruling 82-20 (West's Soc. Sec. Rptg. Serv. Rulings 1983-1991) and Reid v. Chater, 73 F.3d 372 (10thCir. 1995).

 

RICHARD L. PUGLISI
UNITED STATES MAGISTRATE JUDGE